IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

Christy Porco,

    Plaintiff,

v.

Valley-Wide Health Systems, Inc.,

    Defendant.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff Christy Porco, through her attorneys, Diane S. King and Erin K. Ryan, of the law firm of King & Greisen, LLP, for her Complaint and Jury Demand against Valley-Wide Health Systems, Inc. ("VWHS"), alleges as follows:

**JURISDICTION AND VENUE**

1. This action arises under the Constitution and laws of the United States of America and the State of Colorado, including Article III, Section 1 of the United States Constitution. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331 & 1343, and 42 U.S.C. § 1988, as amended by the Civil Rights Attorney Fee Award Act of 1976.

2. This action is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-5(f)(1) and (3), and pursuant to

1

Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981A.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 2000e-5(f)(3), as all of the events giving rise to the claims asserted herein occurred in the District of Colorado of the United States of America.

4. All procedural prerequisites for the filing of this suit have been met. Ms. Porco timely filed a Charge of Discrimination alleging retaliation for engaging in protected activity in opposition to discrimination against Defendant with the United States Equal Employment Opportunity Commission ("EEOC").

5. The EEOC issued a determination on September 2, 2020 that "[b]ased upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes," granting Ms. Porco a right to sue VWHS.

6. Ms. Porco has filed this Complaint within 90 days of receiving a Notice of Right to Sue from the EEOC.

## PARTIES

7. Plaintiff Christy Porco is a woman who currently is, and at all times relevant to this action has been, a citizen of the United States of America and a resident of the State of Colorado.

8. At all times during the events giving rise to this action, Ms. Porco was an employee employed by VWHS.

9. Defendant VWHS is a private non-profit corporation with offices throughout southern Colorado. The office relevant to this action is in Alamosa,

Colorado.

10. At all times relevant to this action, Defendant VWHS has been an employer within the meaning of 42 U.S.C. § 2000e(b).

## FACTUAL ALLEGATIONS

11. Ms. Porco was an employee at VWHS from 1996 to October 4, 2018. Throughout her twenty-two (22) years at VWHS, she worked in various capacities, and in November 1999, she began working in the Human Resources ("HR") department.

12. VWHS is a federally funded Community/Migrant Health Center with several health-care delivery sites throughout rural counties in southern Colorado.

13. Ms. Porco worked in VWHS's Alamosa office.

14. In 2010, Ms. Porco assumed responsibility for VWHS's credentialing and privileging of medical personnel. She reported to VWHS's Human Resources Director.

15. Medical credentialing and privileging are incredibly technical, requiring expert-level knowledge of innumerable government regulations and private practice standards.

16. Ms. Porco was extremely competent at her job and she consistently received high rating in her performance reviews.

17. Ms. Porco's work stood up under numerous outside audits and reviews and was often lauded for its quality.

18. For instance, during 2012 and 2015 on-site visits ("OSV") to inspect

VWHS, the Health Resources & Services Administration ("HRSA")—the federal agency responsible for VWHS's funding—determined that Ms. Porco's credentialing practices met its "Best Practices" standard.

19. In 2017, the Human Resources Director resigned from VWHS and Ms. Porco applied for the open position. After eighteen years in the center's Human Resources division, she was highly qualified for this position.

20. However, CEO Jeanne "Gigi" Darricades, informed the interview committee—in writing—that she wanted a Hispanic male to be chosen for the position.

21. As a result, Ms. Porco did not receive the position, despite her superior qualifications. Instead, a far less qualified candidate—a Hispanic man who had substantially less experience and who reported to Ms. Porco—was chosen for the position.

22. In July 2017, Ms. Porco filed a charge of sex and race discrimination with the Equal Employment Opportunity Commission ("EEOC") against VWHS due to undisputable evidence that VWHS had discriminated against her based on her sex and race in the hiring process for Human Resources Director.

23. VWHS quickly settled Ms. Porco's claim in September 2017, and as part of their settlement agreement, Ms. Porco was given a substantial raise to compensate for the lost pay associated with not receiving the director position.

24. Because Ms. Porco was afraid of retaliation by CEO Darricades for exposing her discriminatory intent, an important part of the settlement was the

appointment of in-house counsel and compliance officer Alonzo Payne to serve as a liaison between Ms. Porco and VWHS.  This arrangement was specifically designed to protect Ms. Porco from retaliation by Darricades.

25.     Payne's liaison role did in fact insulate Ms. Porco from Darricades' hostility for almost a year after the 2017 settlement.  Unfortunately, Payne resigned from VWHS in June 2018.

26.     The month before Payne resigned, in May 2018, CEO Darricades announced her intention to retire as CEO of VWHS.  Although CEO Darricades did not announce the specific date of her retirement, it was generally understood that she would retire by the end of 2018 or the beginning of 2019.  Larry Helms, VWHS's Chief Information Officer ("CIO"), had applied to take over as CEO.

27.     CEO Darricades—the very person whose behavior led to the need for a liaison—then hand-picked the employee to assume Payne's liaison responsibilities regarding Ms. Porco.

28.     Darricades assigned those liaison responsibilities for protecting Ms. Porco from retaliation to Helms, the CIO who had applied for her position.  Helms had no experience with HR or credentialing.

29.     In the meantime, CEO Darricades had made it known that it was her goal to force Ms. Porco out of VWHS before she retired.

30.     It would obviously inure to Helms' benefit in obtaining CEO Darricades' support for replacing her as CEO if he could find a basis upon which to terminate Ms.

5

Porco.

31. In August 2018, just two months after Payne's resignation, Darricades and Helms found an opportunity to force Porco out: an external accreditation review conducted by The Joint Commission ("JC").

32. The JC had found three problems with VWHS's credentialing practices in the August accreditation review. Two of these problems related to documentation of medical providers' credential files, and the third involved VWHS's issuance of temporary privileges.

33. Ms. Porco immediately resolved the two issues with documentation of medical providers' credential files by giving the JC supplementary information.

34. The third issue that the JC identified related to VWHS's practice of issuing temporary privileges—a practice approved by other external review organizations but against JC standards.

35. VWHS had been issuing temporary privileges for years, a procedure that was subject to approval by the Chief Medical Officer ("CMO"). Every temporary privilege that was ultimately granted had to be reviewed and approved by the CMO.

36. VWHS endorsed the issuance of temporary privileges. In fact, on July 17, 2017, CEO Darricades herself explicitly authorized the granting of temporary privileges in an email that she sent to VWHS employees, including Ms. Porco.

37. However, when the JC disapproved of this practice in the accreditation review, Ms. Porco made immediate changes. After the review, Ms. Porco requested that

VWHS change their credentialing policies and stop issuing temporary privileges to comply with JC standards.  As a result, VWHS received full accreditation from the JC.

38. Although issuing temporary privileges was consistent with long-standing VWHS practice, Helms used the JC's critique of this procedure to demand a wide-ranging internal audit of Ms. Porco's credentialing files.

39. Helms had no experience with credentialing or privileging, yet Helms reviewed Ms. Porco's work for the internal audit in August 2018.  Helms then claimed that Ms. Porco engaged in "poor practice habits" and "faulty logic," using vague and conclusory language.  He did not give examples or identify any specific defects with Ms. Porco's work.

40. Soon after the internal audit, on September 10, 2018, Ms. Porco locked the Human Resources office after 5:00 PM and went home.  As was her practice, Ms. Porco left her highly confidential credentialing files locked in an office within the HR department.

41. Later that night, at 10:51 PM, Ms. Porco received a text from Helms instructing her to meet with him first thing the next morning.

42. When Ms. Porco got to work September 11, she promptly met with Helms.  Helms told her that the confidential credentialing files had been removed from the locked office after hours so that VWHS could have an outside audit conducted.  Helms did not disclose who had the files or when they would be returned.  Ms. Porco explained to Helms that HSRA policy required the credentialing files to be kept in a secure, locked

7

location with limited access. Helms still did not reveal who had the files or where they were.

43. The credentialing files were gone for a week.

44. When Ms. Porco came into work on Monday, September 17, she found that the files had been returned to the HR filing room. She also discovered that someone had broken into the filing cabinet in her office. Ms. Porco had locked the filing cabinet door on Friday evening, but on Monday she found that the lock was broken and the door was ajar. The cabinet contained several credentialing files. Ms. Porco reported the break-in to Human Resource Director Alifonso Baroz and completed an incident report.

45. Ms. Porco never learned the findings of the purported external audit—never learned who the auditor was, which files were reviewed, or what specific deficiencies, if any, were identified.

46. On September 21, VWHS outside counsel Nick Sarmiento called Ms. Porco to a meeting with himself, Helms, and compliance manager June Rodriguez. Porco had no advance notice of this meeting.

47. Sarmiento accused her of supposed defects in various files, claiming that those defects were identified by the alleged external audit. When Ms. Porco asked to know which files were flawed and what the problems were, he ignored her questions.

48. Instead, Helms and Sarmiento ordered Ms. Porco to obtain a large number of secondary documents, mostly originals. Ms. Porco was given until September 26— five (5) days—to produce these documents.

49. Ms. Porco protested that she could not obtain all these documents in only five (5) days and that no internal or external credentialing standard required original copies of these documents.  Helms and Sarmiento ignored her objections.

50. Ms. Porco worked over sixty (60) hours the next several days to obtain the required documents.  Ms. Porco brought all but two (2) of the fifteen (15) files Helms and Sarmiento had required by the September 26 deadline.

51. After Ms. Porco managed to comply with the nearly impossible task she had been given on September 21, she had no contact with Helms until he called her into another meeting on October 4.  Helms informed her that the alleged external audit had uncovered *more* problems with her files, though he did not explain why these issues had not been raised with Ms. Porco earlier.

52. When Ms. Porco asked which files were non-compliant, Helms refused to answer.  Mr. Porco asked for details about *how* the files were non-compliant.  Helms refused to answer.  Instead, Helms said he would get back to her and left the room.

53. Half an hour later, Helms and Sarmiento called Ms. Porco into another meeting and told her that she was terminated, effective immediately.  No HR representative was present, despite VWHS policy requiring HR involvement in every termination.

54. After firing Ms. Porco, Helms and Sarmiento escorted her to her office, where they watched her clean out her desk.  Porco had to remove every item from her desk and lay it out for their inspection, put her personal possessions in a box, and the rest

was left on top of the desk.

55. On October 8, four days after Helms and Sarmiento had thoroughly inspected the contents of Ms. Porco's desk, HR Assistant Megan Blea claimed that she and Human Resource Director Baroz found an alleged forgery device in Ms. Porco's "desk area." Blea purported to find two documents taped together in a way that allowed signatures on one document to be traced onto another.

56. Blea is the employee who replaced Ms. Porco after she was terminated.

57. Baroz is the less-qualified Human Resources Director whose promotion Ms. Porco protested.

58. On December 7, 2018—over two months after Blea and Baroz claimed to discover the supposed forgery device—Helms, Sarmiento, and Rodriguez reported to law enforcement the false, malicious allegation that Ms. Porco had forged signatures on credentialing and privileging documents.

59. Their false claims led the District Attorney ("DA") of Alamosa to prosecute Ms. Porco for crimes that she did not commit. In March 2019, the DA charged Ms. Porco with two counts of forgery, accusing her of "feloniously…alter[ing]…a written instrument" with the "intent to defraud Gigi Darricades" and Board of Directors Secretary Alondra Chamarro.

60. Each count of forgery, a class five (5) felony, exposed Ms. Porco to up to three years in the Department of Corrections ("DOC") upon conviction.

61. Ms. Porco lost her new job working in HR for Alamosa County as a direct

10

result of the false criminal charges against her.

62. Since then, Ms. Porco could not obtain alternative employment. She has only been able to obtain part time, contract work, and even that ended with the onset of the COVID-19 pandemic.

63. Ms. Porco had to retain and pay for the services of a criminal defense attorney and incurred substantial costs in doing so.

64. Ms. Porco never pleaded guilty to theses false charges. However, in order to stop incurring attorney's fees and better her chances of finding new employment, on July 8, 2020, Ms. Porco agreed to participate in a pretrial diversion program, through which she would complete twenty-four (24) hours of community service and a cognitive thinking class in exchange for a dismissal of all charges. Ms. Porco did not plead guilty to participate in this program.

65. Ms. Porco successfully completed the diversion program in under three (3) months.

66. On September 22, 2020, the DA's Office dismissed the baseless charges against Ms. Porco.

**FIRST CLAIM FOR RELIEF**
**(Retaliation in Violation of Title VII)**

67. Plaintiff hereby incorporates by reference all allegations set forth above.

68. Ms. Porco engaged in activity protected by Title VII: Porco opposed VWHS's unlawful discrimination in the hiring process for the Human Resources Director

position and filed a charge of discrimination with the EEOC.

69. After Ms. Porco engaged in protected activity, VWHS subjected her to objectively and materially adverse employment actions: (a) VWHS subjected Ms. Porco to a pretextual and prejudiced investigation; (b) VWHS terminated Ms. Porco's employment; and (c) VWHS subsequently attempted to frame Ms. Porco for forgery by reporting false allegations to law enforcement, leading to a prosecution of Ms. Porco for a crime that she did not commit. These actions, by themselves or considered as a whole, might dissuade a reasonable worker from making or supporting a charge of discrimination.

70. There is a causal connection between Porco's filing of the 2017 discrimination charge, a protected activity, and VWHS's pretextual investigation, unlawful termination, and malicious prosecution of Porco, adverse employment actions. The settlement that resolved Ms. Porco's 2017 charge involved the appointment of an intermediary, Payne, to protect her from retaliation by VWHS and Darricades. Payne's appointment served its purpose: while he remained at VWHS, Ms. Porco was safe, and there is no evidence that VWHS acted against her. But in September 2018, under three months after Payne left VWHs, VHWS struck out against Ms. Porco by initiating a pretextual investigation into her performance. Shortly after, VWHS concocted baseless grounds to terminate Ms. Porco, fabricated evidence of a crime, and incited law enforcement to maliciously prosecute her. The timing of VWHS's series of attacks— mere months after the retirement of Payne, Ms. Porco's protector—betrays the causal connection between Ms. Porco's protected activity and VWHS's adverse employment

actions against her.

71. The effect of VWHS's practices deprived Ms. Porco of equal employment opportunities and otherwise adversely affected her employment status because of her complaints of discrimination and retaliation.

72. These unlawful employment practices were intentional.

73. VWHS engaged in the unlawful employment practice with malice or with reckless indifference to Ms. Porco's federally protected civil rights.

**SECOND CLAIM FOR RELIEF**
(Abuse of process)

74. Plaintiff hereby incorporates by reference all allegations set forth above.

75. VWHS had an ulterior purpose in initiating and participating in the criminal legal proceedings against Ms. Porco. VWHS sought to use the criminal prosecution of Ms. Porco to achieve its own retaliatory agenda: to punish Ms. Porco for filing her discrimination suit and to assure that her departure from VWHS would remain permanent. Criminal prosecutions are not designed for such purposes.

76. VWHS used the criminal legal proceedings against Ms. Porco in an improper manner. VWHS willfully acted in a manner not proper in a criminal prosecution's regular course: (a) VWHS fabricated evidence against Ms. Porco; (b) knowingly reported false allegations to law enforcement; and (c) gave falsified evidence to law enforcement to assist in her prosecution.

77. VWHS caused financial and emotional damages to Ms. Porco. As a result of this baseless prosecution, Ms. Porco lost her job and had to pay a criminal attorney to

assist in her defense. Ms. Porco also suffered emotional distress from the prospect of up to six (6) years' imprisonment, the threat of two (2) felony convictions, and the reputational damage of criminal accusations.

WHEREFORE, Ms. Porco respectfully requests that this Court enter judgment in her favor on her claim and award the following relief to her:

Compensatory damages, including, but no limited to, those for past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish and other nonpecuniary losses;

a. Punitive damages as allowed by law in an amount to be determined at trial;

b. Actual economic damages and consequential damages arising out of Defendant's conduct;

c. Declaratory relief and other appropriate equitable relief;

d. Pre-judgment and post-judgment interest at the highest lawful rate;

e. Reasonable attorney's fees and costs, including expert witness costs, as otherwise allowed by law;

f. Any and all relief as allowed by law or as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 25th day of November 2020.

King & Greisen, LLP

*/s/ Diane S. King*
Diane S. King, #16925

>Erin K. Ryan, #50400
>1670 York Street
>Denver, Colorado 80206
>Telephone: (303) 298-9878
>Fax: (303) 298-9879

Plaintiff's Address:

1015 2nd Street
Alamosa, CO  81101